FILED
AUG 16 2007
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>HOA KY HANG,<br><br>    Debtor.<br>_____<br><br>KENNETH SANDERS, Chapter 7 Trustee,<br><br>    Plaintiff,<br><br>v.<br><br>QUAN KY HANG,<br><br>    Defendants. | Case No. 05-30655<br><br><br><br><br>06-02274-C<br>Adversary No. ~~06-02267-C~~<br><br><br><br><br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

Pursuant to Fed. R. Bankr. Proc. 7052 and Fed. R. Civ. Proc. 52, the court makes the following findings of fact and conclusions of law.

Trial was conducted in this matter on June 4, 2007. Thomas R. Phinney, Parkinson Phinney, appeared on behalf of chapter 7 trustee Kenneth Sanders ("Trustee" or "Plaintiff"). Tuan Van Lai appeared on behalf of defendant Quan Ky Hang ("Defendant" or "Quan Hang"

or "Son").

Plaintiffs Local Rule 9017 Exhibits, pages 1 to 458, were admitted into evidence, referred to herein as "TX" for Trustee's Exhibits, with reference to the page number(s) and line number(s) if applicable.[1] Defendant's Local Rule 9017 Exhibits, pages 1 to 198, together with a statement relating to Defendant's liquidation of stock ("Tab 0"), were admitted into evidence, referred to herein as "QX," for Quan Hang's Exhibits, with reference to the page number(s) and line number(s) if applicable.

Any conclusions of law herein that are more properly characterized as findings of fact, shall be treated as findings of fact

## I. FINDINGS OF FACT

1. In 1990, the Debtor bought a house commonly known as 7809 39th Avenue, Sacramento, 95824 ("the House"). TX, p. 8 (1st ¶).

2. In 1992, the Debtor brought his son Quan Hang, from Vietnam to live with Him at the House. The Son was approximately 18 years old at the time. QX, p. 1 (¶¶ 4, 6, 7).

3. From 1992 through 2000, the Son lived in the House without paying rent or other property-related expenses. [Request for Admission ("RFA") 20, 21, TX227, 240].

4. The Debtor was a partner in establishing a Vietnamese language magazine called Lang Magazine, where he worked for many years. The Debtor got his Son a job there in 1998, and the Debtor and his Son worked at Lang Magazine together until 2003 when the Debtor stopped working there. The Son continues to work at Lang Magazine. Since 2001, the Son has worked full time at Lang Magazine earning $2,000 per month. TX p. 386 (Depo Tr. p.23); TX p. 232 and 242 (Interrogatories 55 to 61);

---

[1] Plaintiff's 9017 Exhibits, Tabs 1, 2, and 24, 25, are court documents and were included for reference.

5. In or about January, 2001, the Son began paying the monthly mortgage on the House in the approximate amount of $600 per month. TX 80, 86 (Interrogatory 9, 10); TX 189 (1st mortgage payment, check no. 740 on February 14, 2001 in the amount of $601.02.).

6. On February 12, 2002, the Father filed a chapter 13 petition, Case No. 02-21550. TX p.41-60. The Debtor claimed the House as his exempt homestead, which was essentially his only asset as shown on his schedules. Also as shown in the schedules, the Debtor had over $80,000 in debt.[2] The case was voluntarily dismissed on April 25, 2002. TX p.72.

7. In 2002, the Debtor obtained a $90,000 loan from Duc Nguyen (TX p.23) and a $49,000 loan from Michelle Stoskoff (TX p.25). In 2003, the Debtor obtained an $80,000 loan from Xong Lu (TX p.23). In 2003, Wells Fargo obtained a judgment against the Debtor in the amount of $25,000 (TX p.25).

8. On December 3, 2002, while insolvent, Father executed a grant deed of the House to the Son. The transfer is identified on the deed as a "gift." (TX p. 290). This transfer is hereafter identified as the "Transfer."

9. At the time of the Transfer: (1) the Debtor was insolvent; (2) the Debtor was engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; and (3) the Debtor had incurred debts, and continued to incur debts, that were beyond his ability to pay as they became due.

10. As set forth in the Debtor's written statement to the Trustee, his Son did not pay the Debtor anything for the House, and the Debtor did not receive any consideration. TX p.8 (1st ¶).

11. In January 2004 (thirteen months after the Transfer), the Son refinanced the

---

[2] Note that the totals shown at the bottom of some of the pages of the Debtor's Schedule F are understated.

house. See TX p.248 (closing statement). From the refinance proceeds, the Son paid off **$25,474.23** in credit card debts owing by the Son. (TX p.248). Although all of the credit cards were owed by the Son, at trial the Son explained that one of the credit card debts ($4,714 owing to Chase Mastercard) was a credit card under the name of Son and the Father jointly. From the refinance, there was also **$16,374.36** in cash proceeds, which the Son deposited into his account. (TX p.248, p.441, p.440; QX 136).

12. The Son claims he gave the $16,374.36 in cash to the Father, but bank records establish that the funds, less $2,000 in cash, were deposited into the Son's account. TX p. 441, 440 (escrow check), QX p. 136 (bank statement). In his deposition (prior to the Trustee having obtained the specific bank deposit records), the Son was questioned about a $14,373 deposit in January 2004 that appeared to be the refinance proceeds. The Son testified that the funds were not from the refinance but were supposedly from "cash" accumulated from his wife's 2003 earnings and from the Son's modest earnings of $2,000 per month. The Son testified he set aside cash until $14,374 was accumulated and then deposited in the bank account. See TX p.387-88 (Depo 29:18- 25; 32:2-11). The Son's tax returns report no income for the wife in 2003. TX pp. 328-333.

13. In January 2005, the Son sold the House and received **$116,253** in proceeds, which went into the Son's bank account. TX p89, QX p.168. **$72,570** was used as the down payment to purchase a new house at 8431 Jordan Ranch Road, Elk Grove CA 95624 (the "2nd House"). TX p.123, QX p.172 (two deposits of $71,745 and $825).

14. On August 30, 2005, the Father filed a chapter 7 petition. He testified in his Statement of Financial Affairs that the Transfer of the House to the Son was a gift. TX p.33 (SFA ¶ 7: Transfer of House was Gift.).

15. In 2004 and again in 2005, the Debtor asked the Son to put the Debtor on title

to the 2nd House. The Son did not respond to the Debtor's requests. TX p.390 (Depo Tr. 39:9-40:2).

**Son's Defense**

16. The Son contends that in January 2001, the Father orally agreed to transfer title to the House to the Son if the Son would pay property related expenses going forward and for "reasonable cash payments." The Son admits, however, never discussed with the Father what the amount or timing of the "reasonable cash payments" would be. The evidence regarding the "agreement" includes the following:

Rog 69: Please identify **each communication** between YOU and the DEBTOR concerning the sale of the [House]. [TX p.234]
Response: **1/2001:** Debtor agreed to sell [the House] to Defendant. [TX p.243]

Rog. 67: If there was an agreement between YOU and the DEBTOR concerning the transfer of the [House] to YOU, please state each and every term of the agreement.
Response: Debtor to transfer title to Defendant if Defendant pay for all property-related expenses plus **reasonable cash payments** to him. TX p.243.

Depo Question: Did you ever talk about how much you were going to pay your dad for the house?
Answer: **No.** TX p.383, p 11:13-15.

17. In June 2004, the Son reports that he received $20,000 in cash as a "cash-out" of his interest in "Copy & Print," a business. The Son says he gave the cash to his Father. Because the Debtor has no records to support his claim that he gave this cash to his Father, and because the Debtor's written statement provides that the Son did not pay him anything or provide consideration for the House, and because the Son's testimony was not credible at least with respect to the disposition of the $16,374.36 in refinance proceeds in January 2004, the court is not convinced that the Son actually gave the Debtor $20,000 in cash. Further, the court is convinced that to the extent the Son gave the Debtor cash from the "cash-out" of the

Son's interest in Copy & Print, such payment of cash was not given in consideration for the Transfer of the House.

18. During January 2004 through June 2005, the Son says he gave the Father $10,744 in **cash**, in increments varying from $300 to $2,314. See response to Rog 23, TX p.240 (listing dates and amounts of alleged payments). His only documentation is bank statements showing cash withdrawals from his account. Each and every time there is "cash withdrawal" on his bank statement during 2004 and 2005, the Son claims that he gave all such cash to his Father. TX 389, p.34. The court does not believe that the Son gave the Debtor all of the cash shown on these cash withdrawals totaling $10,744. Further, the court is convinced that to the extent the Son gave the Debtor cash from these transactions, such payments of cash were not given in consideration for the Transfer of the House.

19. Checks obtained by the Trustee from Bank of America on May 10, 2007, show that in early 2004 (right after the refinance loan) the Son wrote two checks to the Debtor, one for $5,000 and one for $2,000. TX 443, 445. At trial, the Son claimed that these payments and also another $2,000 check also recently obtained by the Trustee (TX p. 444) were also part of his "reasonable cash payments" for the House. The court finds that none of these transfers are part of any consideration for the Transfer of the House.

20. The only income that the Son had during 2001 through 2005 was $2,000 per month salary from Lang Magazine. The Son's wife earned no income in 2002 or 2003, and earned $5,019 in 2004 and $2,800 in 2005. See TX Tab 21 (tax returns 2000 to 2005); Responses to Interrogatories 56 and 57, TX p.233, TX, p.242. The Son only had one bank account. See Response to Interrogatory 65 (TX, p.234, TX, p.242; QX 71-187 (Son's Bank Statements Jan. 01 to Dec. 05). The Son had very little financial ability to pay his Father anything, except as to monies generated from the refinance and sale of the House. With

-6-

possible minor exceptions, all of these funds were retained by the Son and also were used to buy the 2nd House.

21. The Defendant did not provide any substantial evidence in support of any improvement to the House or the 2nd House.

22. As to the findings of fact stated above, to the extent they are based upon references to Defendant's deposition testimony and discovery responses, the Defendant also testified consistently with these responses at trial.

## II. SUMMARY OF PROCEEDS RECEIVED BY QUAN HANG

> **Refinance** of House: TX, p.248 (1/04)
>     **$25,471 credit cards paid**
>     **$16,374  cash**
> subtotal     **$41,845**
>
> **Sale** of House: TX, p.89 (1/05)
>     **$116,253**
>         $72,570 used for 2nd House
>         $43,683 net cash to Defendant

## III. THE TRANSFER OF THE HOUSE IS AVOIDABLE

Turning to conclusions of law, Section 544(b) of the Bankruptcy Code permits the Trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may

have. *Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir.1988).  Specifically, § 544 of the Code provides that "the trustee may avoid any transfer of an interest of the debtor in property...that is voidable under applicable law by a creditor holding an [allowable] unsecured claim..." 11 U.S.C. § 544(b). Under California law, an unsecured creditor may avoid a fraudulent transfer. Cal. Civ.Code §§ 3439.04, 3439.07.  A transfer is fraudulent if the debtor made the transfer or incurred the obligation as follows:

> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2) **Without receiving a reasonably equivalent value in exchange for the transfer** or obligation, and the debtor either
>
>> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Cal. Civ.Code § 3439.04(a).

The Trustee has satisfied all of the elements of avoiding the Transfer.

"<u>Solvency.</u>" The Debtor was insolvent at the time he made the Transfer in December, 2002 under any measure, including under Civ. Code § 3439.04(2)(A) and (2)(B), and 3439.05.

<u>There was No Reasonably Equivalent Transfer</u>. The Son's defense in this case is that he gave **"reasonably equivalent consideration"** and that it was **"in exchange"** for the Transfer.  The Son failed to establish reasonably equivalent value in this case for four independent reasons:

(1) The Debtor admits that he did not receive **any** consideration, and the court believed this statement.

(2) The disputed "consideration" alleged by the Son was given years after the fact and

was **not** given **"in exchange"** for the Transfer;

(3) The equivalency of the consideration is evaluated at the time of the Transfer. See e.g., *In re Morris Communications NC Inc.,* 914 F.2d 458 (4th Cir. 1990). At the time of the Transfer all the Son says that the Debtor got was his **unenforceable** oral promise to make "cash payments" in an unspecified amount and at an unspecified time, and thus the consideration was not reasonably equivalent. The Son's promise was legally unenforceable for two independent reasons: (1) the alleged "agreement" violated the Statute of Frauds (Civ. Code § 1623(a)(3)), which requires that agreements relating to the sale of the real property be in writing to be enforceable, and (2) the alleged sale agreement even as portrayed by the Son was totally illusory because it did not include a price term or other basic terms. Instead, the Son allegedly promised to make, at his discretion, such payments in such amounts and at such times as he deemed "reasonable." Thus, even if the Son's testimony about the agreement was believed (and the court did not believe it), there is no reasonably equivalent consideration.

(4) Even if, as the Son alleges, any alleged undocumented and disputed cash transfers claimed to have been made by the Son to the Debtor were accumulated and counted by the court as retroactive consideration for the Transfer, the "consideration" amounts to less than $20,000 (three checks totaling $9,000 written after the refinance escrow, and possibly small additional cash payments),[3] and thus is not reasonably equivalent to the $80,000 put forward by the Son as the the amount he thought he should pay the Debtor. See e.g., TX 383, Depo Tr. 11:9-12.

Intent to Defraud. In this case, the Debtor does not dispute that the Transfer was an outright gift. The Transfer was made at a time when the Debtor was significantly insolvent, and at a time when the Debtor was accumulating significant additional debt. Under the

---

[3] The court does not include the alleged $20,000 Copy & Print payment, but again, even if it and everything else is included, it is a total of $40,000 well after a Transfer the Son contends had a value of $80,000.

circurnstances, I am convinced that the Transfer was made with actual intent to hinder delay or defraud creditors.

Present and Future Creditors. The credit card debt shown on the Debtor's 2002 Schedules remained unpaid over the next three years and is carried forward onto the Debtor 2005 Schedules. The Debtor also accrued substantial new debt in 2002 and 2003.

Avoidance. Because the Transfer was made by an insolvent, and the Debtor did not receive reasonably equivalent consideration in exchange for the Transfer, and because the Transfer was made with actual intent to defraud, the Transfer is avoidable.

## IV. THE TRUSTEE IS ENTITLED TO RECOVER THE PROPERTY AND/OR THE VALUE OF THE PROPERTY UNDER SECTION 550, INCLUDING THE APPRECIATION IN THE VALUE OF THE HOUSE

Once a trustee demonstrates the right to avoid a transfer, the trustee is entitled to recover the transfer or the value of the transfer pursuant to § 550(a). *In re Acequia, Inc.*, 34 F.3d 800, 809 (9th Cir.1994); *In re Brun*, 366 B.R. 669, 672 (Bankr. C.D.CA 2007). Section 550 provides in relevant part that:

> [T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, **the property transferred**, or, if the court so orders, **the value of such property**, from
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

11 U.S.C. § 550(a)(1). Section 550 separates the concepts of avoiding a transfer and recovering from the transferee. *In re Acequia, Inc.*, 34 F.3d 800, 809 (9th Cir.1994); *In re Brun*, 366 B.R. 669, 672 (Bankr. C.D.CA 2007) (citing H.R.Rep. No. 95-595, at 375 (1977).

The trustee is entitled to recover the "greater of the value of the transferred property at the transfer date or the value at the time of the recovery." Collier on Bankruptcy, 15th ed.,

¶ 550.02 [3]; *Brun*, 366 B.R. 669, 674-75 (Bankr. C.D.CA 2007); Langhorne v. Warmus (*In re American Way Serv. Corp.*), 229 B.R. 496, 530-31 (Bankr.S.D.Fla.1999) ("[W]hen the property has appreciated, the trustee is entitled to recover the property itself, or the value of the property at the time of judgment"); Govaert v. B.R.E. Holding Co., Inc. (*In re Blitstein*), 105 B.R. 133, 137 (Bankr.S.D.Fla.1989) ("[T]he Trustee is entitled to at least a money judgment in the amount of the greater of the value at the time of the transfer; or the value at the time of recovery less the value of improvements made.").

As noted by Collier, this result is consistent with the well-established purpose of § 550, to restore the estate to the position it would have occupied had the property not been transferred. Moreover, a trustee has the option (if available) to recover the property transferred, which means the estate would benefit from any appreciation. Section 550(e) demonstrates the intent of Congress that any appreciation not attributable to the actions of a good faith transferee inures to the benefit of the estate. Pursuant to § 550(e), a good faith transferee is entitled to a lien to secure the lesser of the cost of any improvements, or an increase in value as a result of such improvements. *See* 11 U.S.C. § 550(e); *see also* Collier on Bankruptcy, supra, ¶ 550.02[3].[4]

In this case, the result of the avoidance of the Transfer is that the Trustee is entitled to recover from Defendant the value and/or property that he received as a result of the January 2004 refinance, and the January 2005 sale. As set forth above, approximately half of these proceeds are directly traceable as the purchase price for the 2nd House.

The burden is on the Defendant to establish entitlement as a good faith transferee to a lien on the property recovered pursuant to 11 U.S.C. § 550(e). Given the contrast between

---

[4] Collier also notes that this result serves the equitable underpinnings of restorative justice by discouraging a "wait and see" approach by transferee defendants holding property, such as stock, that may be subject to wide, rapid swings in value on account of volatile markets. Likewise, as noted in the legislative record, "a transferee has an opportunity to benefit by delay, and there are possibilities for abuse where the transferred property is appreciating substantially in value." Id. at footnote 6.

the testimony of the Debtor and the Defendant, given the lack of any meaningful consideration given by the Son, and given the credibility problems with the Defendant's testimony, the court is not persuaded that the Defendant is a good faith transferee. Additionally, the Defendant did not put forth any testimony at trial or in his 9017 Declaration to support a finding that he made any improvement to the House or the 2nd House. Accordingly, the Defendant is not entitled to any lien on the recovery pursuant to 11 U.S.C. § 550.

## V. A CONSTRUCTIVE TRUST IS AN APPROPRIATE REMEDY

A constructive trust is an involuntary equitable trust created as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. *Communist Party v. 522 Valencia*, Inc., 35 Cal.App.4th 980, 990 (1995). California Civil Codes §§ 2223 and 2224 set out the circumstances under which constructive trusts are generally imposed. Cal. Civil Code § 2223 states: "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civil Code § 2224 states: "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

The imposition of a constructive trust requires" (1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it. *Communist Party*, 35 Cal.App.4th at 990. The wrongful act giving rise to a constructive trust need not amount to fraud or intentional misrepresentation. All that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by defendant would constitute unjust enrichment. *Calistoga Club v. City of Calistoga*, 143 C.A.3d 111, 116 (1983). The concept of constructive trust is an equitable remedy to prevent unjust enrichment and enforce restitution. *Haskel Engineering Supply v. Hartford Accident and Indemnity*

*Company*, 78 C.A.3d 371 (1978)

Where property is improperly used, the innocent party such as a bankruptcy trustee can choose either to enforce a lien on the property for the value of the estate's funds or to enforce a constructive trust on the property. Restatement of Restitution § 210; *Primeau v. Granfield*, 184 F. 480 (S.D.N.Y.) (L. Hand, J.), *rev'd on other grounds*, 193 F. 911 (2d Cir.1911), *cert. denied*, 225 U.S. 708 (1912). The holders of the property have "an equitable duty to convey it" to the beneficiary, here the trustee. *Provencher v. Berman,* 699 F.2d 568 (1st Cir. 1983)

In *Provencher v. Berman*, 699 F.2d 568 (1st Cir. 1983), the court held in that case that the bankruptcy trustee was entitled to an undivided share of real property "equivalent to the proportion which his funds bore to the total amount (other than mortgage loans) used by the [Defendants] to buy the house." In that case, the court awarded the trustee an undivided interest in the house of 47.9%. *Id.* at 570. The court explained in part as follows:

> The trustee would be entitled to the entire property only if the [Defendant transferee] had used solely estate funds (or estate funds plus borrowed funds) to buy the property. . . . Where, as in this case, the holder used commingled funds to buy the property subject to a mortgage, according to the authorities we cited, the beneficiary of the constructive trust (here the trustee in bankruptcy) may take title to a proportionate share of the entire property, subject to the mortgage. [citations omitted]

Id. at 570-71.

In *In re Linsey*, 296 B.R. 582 (Bankr. Mass 2003), the debtor embezzled funds and purchased two vehicles and used approximately $25,000 to make improvements to her house. The court imposed a constructive trust on the two vehicles, but with regard to the house, the court concluded that since the funds were used to make improvements rather than to purchase the house, a more appropriate remedy than imposing a constructive trust over an undivided portion of the house, the court granted the trustee an equitable lien in the amount of the funds used for the improvements.

-13-

In this case, it is undisputed that all of the funds used by the Son to purchase the 2nd House came from the sale proceeds of the first House. The Trustee has satisfied all of the elements requisite to the imposition of a constructive trust. Accordingly, the imposition of a constructive trust in favor of the Trustee on the 2nd House is appropriate.

With respect to the balance of the value of the Transfer not used to purchase the 2nd House ($41,845 from the January 2004 refinance of the House and $43,683 in sale proceeds from January 2005 sale), the Trustee is entitled to a money judgment.

Dated: 8-13-07

*/s/ Richard T. Ford*

RICHARD T. FORD
UNITED STATES BANKRUPTCY JUDGE